UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JOSEPH EDWARD CORCORAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | CAUSE NO. 3:05-CV-389 AS |
| v. | ) | |
| | ) | |
| ED BUSS, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

### *OPINION AND ORDER*

This proceeding is a habeas corpus petition filed by counsel on behalf of the petitioner, Joseph Edward Corcoran, seeking relief under 28 U.S.C. § 2254 from a state court criminal proceeding in which he was sentenced to death. Oral argument was held on the petition in Lafayette, Indiana on March 19, 2007. This court greatly appreciates the work of all counsel in this difficult matter, but specifically notes the able services rendered by appointed counsel for Mr. Corcoran.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The procedural history of this case is unusual and more convoluted than normal so it is particularly important to lay it out fully here. There are five published opinions of the Supreme Court of Indiana related to this case.

> *Corcoran v. State*, 739 N.E. 2d 649 (Ind. 2000)
>
> *Corcoran v. State*, 774 N.E. 2d 495 (Ind. 2002)
>
> *Corcoran v. State*, 820 N.E. 2d 655 (Ind. 2005)
>
> *Corcoran v. State*, 827 N.E. 2d 542 (Ind. 2005)
>
> *Corcoran v. State*, 845 N.E. 2d 1019 (Ind. 2006)

Each will be discussed later in this opinion as necessary. The state record has been filed and examined here pursuant to the mandates of *Townsend v. Sain*, 372 U.S. 293 (1963), as well as 28 U.S.C. § 2254.

> Joseph E. Corcoran was under stress because his sister's upcoming marriage would necessitate his moving out of her house. And his brother said Corcoran could not move in with him.
> He awoke one afternoon to hear his brother and others downstairs talking about him. Irritated, he loaded his rifle and went downstairs to intimidate them, but as Corcoran said later, "It just didn't happen that way." (R. at 1988.) Corcoran killed his brother, his sister's fiancé, and two other men in the ensuing incident.

*Corcoran v. State*, 774 N.E.2d 495, 497 (Ind. 2002).

> On July 26, 1997, Corcoran was lying on his bedroom floor and heard men's voices. He became upset because he thought the men were talking about him and took a semi-automatic rifle downstairs to confront them. In the living room were four men, including Corcoran's brother and future brother-in-law, both of whom lived in the house with Corcoran.
> Corcoran shot and killed Jim Corcoran, Scott Turner and Timothy Bricker at close range. The final victim, Doug Stillwell, tried to escape, but Corcoran chased him into the kitchen and shot him in the head.

*Corcoran v. State*, 774 N.E.2d 495, 501 (Ind. 2002)

On July 31, 1997, Mr. Corcoran was charged with four counts of murder. Trial Record at 29-36. Nine and a half months later, on May 11, 1998, the state withdrew from negotiations with the defendant. Trial Record at 151. Two days later, on May 13, 1998, the state filed four applications for the death penalty. Trial Record at 111-118. On May 10, 1999, the state filed four amended applications for the death penalty which were granted on May 13, 1999. Trial Record at 369-377. Jury Selection began on May 17, 1999. Trial Record 664. The selected jury was sworn on May 19, 1999. Trial Record at 1605-06. The trial, under cause number 02D04-9707-CF-465 began on May 20, 1999. Trial Record at 1609. The jury went out at 10:40 A.M. on May 22, 1999. Trial Record at 2207. Less than an hour later, Mr. Corcoran was found guilty on all four counts of murder. Trial

Record at 460-63, 2209-10, and 2214. The penalty phase began on May 24, 1999. Trial Record at

2215. The jury went out at 9:30 a.m. on May 25, 1999. Trial Record at 2522. Less than two hours

later, the jury recommended the death penalty on all four counts. Trial Record at 556-59, 2525-29,

and 2533. On August 26, 1999, the judge imposed the death sentence. Trial Record at 2573-78.

On direct appeal, Mr. Corcoran sought review of only his death sentence. By counsel, he

explicitly waived an appeal of the findings of guilt. Appendix to Appellant's Brief, file marked

March 30, 2004, at 205. In his affidavit, he stated,

> [A]t this time I confirm my position that I do wish to waive my appeal of the
> underlying murder convictions in this case . . . I am requesting a review of my
> sentencing in this case . . . I understand that a waiver of my murder convictions is a
> final decision and is irreversible . . . .

Appendix to Appellant's Brief, file marked March 30, 2004, at 206. His appellate brief closed by

asking, "that the death penalty in this case should be set aside and requests the Court to do so."

Docket # 32-3 at 69. The Supreme Court of Indiana recognized that Mr. Corcoran did not seek

review nor reversal of his convictions.

> Appealing from the trial court judgment, the defendant does not challenge the guilt
> phase proceedings or his resulting convictions. His appellate claims concern only the
> penalty and sentencing proceedings and his death sentence.

*Corcoran v. State*, 739 N.E. 2d 649, 651 (Ind. 2000).

On December 6, 2000, a unanimous Indiana Supreme Court vacated the death sentences and

remanded the case for re-sentencing. *Corcoran v. State*, 739 N.E. 2d 649 (Ind. 2000). Justice

Dickson wrote the opinion and was joined by three other justices; Chief Justice Shepard concurred

in the decision with a separate opinion.

> From the combination of the trial court's remarks in open court that she was
> "convinced in her heart of hearts" that the defendant, "if given the opportunity, would
> murder again," Record at 2916, and of the court's written references in the sentencing

> statement to the innocence of the victims and the heinousness of the murders, we find a significant possibility that the trial court may have relied upon non-statutory aggravating factors in deciding whether to impose the death penalty. We therefore remand this cause to the trial court to redetermine from the evidence already presented whether to impose the death sentence, life without parole, or a term of years, based only upon mitigating and proper aggravating circumstances, and to issue a new sentencing statement.

*Corcoran v. State*, 739 N.E.2d 649, 657 (Ind. 2000).

On September 30, 2001, Mr. Corcoran was re-sentenced to death. Supplemental Record at 46-50. Again the case returned to the Indiana Supreme Court which affirmed on September 5, 2002. *Corcoran v. State*, 774 N.E. 2d 495 (Ind. 2002). Chief Justice Shepard wrote the opinion and was joined by three other justices; Justice Rucker dissented with a written opinion. He began by stating "I respectfully dissent because I do not believe a sentence of death is appropriate for a person suffering a severe mental illness." *Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002) (Rucker J., dissenting). The petition for rehearing was denied in an unpublished opinion on March 4, 2003. Docket # 1-4.

On May 8, 2003, the trial court submitted a proposed case management schedule to the Supreme Court of Indiana. Docket # 32-14 at 3. On May 30, 2003, the Supreme Court of Indiana approved the proposed case management schedule and set the date for filing a petition for post-conviction relief for September 9, 2003. Docket # 32-14 at 4. On August 27, 2003, post-conviction counsel filed a motion seeking to extend that deadline stating,

> Due to our client's mental illness outlined in the Notice of Intent filed on April 2, 2003, counsel's ability to 'confer with petitioner and ascertain all grounds for relief' pursuant to Ind. Post-Conviction Rule 1(9)(c) and to fulfill our duty to investigate the case pursuant to ABA Standards for Criminal Justice Prosecution Function and Defense Function 4-4.1 has been severely inhibited. This obstacle makes it extremely difficult for counsel to file an initial Petition for Post-Conviction Relief by September 9, 2003.

4

Appendix to Appellant's Brief, file marked March 30, 2004, at 55-56. That motion was denied by the post-conviction court on August 29, 2003. Appendix to Appellant's Brief, file marked March 30, 2004, at 58.

On September 9, 2003, the last day before the deadline expired, post-conviction counsel filed an unverified Petition for Post-Conviction Relief. Appendix to Appellant's Brief, file marked March 30, 2004, at 88-136 and also 142-190. At the same time, counsel also filed a motion to determine competency, stating, "Joseph E. Corcoran did not sign his Petition for Post-Conviction Relief . . .." Appendix to Appellant's Brief, file marked March 30, 2004, at 59. On September 30, 2003, the post-conviction court struck the post-conviction relief petition.

> Pursuant to the Supreme Court's Order of May 30, 2003, approving the Trial Court's Case Management Schedule, the defendant was to file his Petition for Post-Conviction Relief on or before September 9, 2003.
>
> On September 9, 2003, counsel for the defendant filed, by certified mail, documents entitled "Petition for Post-Conviction Relief" and "Verified Motion to Determine Competency."
>
> The document entitled "Petition for Post-Conviction Relief is neither signed by the defendant, nor verified to contain all grounds known to defendant for vacating, setting aside, or correcting the conviction and sentence.
>
> Pursuant to long standing case law, [the most recent being *White v. State*, 793 N.E. 2d 1127 (Ind. App. 2003)] and the rules governing post-conviction relief requiring signature by the defendant and verification, the Court orders the Petition returned to counsel, stricken from the record and notifies the Supreme Court by this Order of the defendant's failure to comply with the Trial Court's Case Management Schedule, and his failure to comply with the Rules for Post-Conviction Relief.
>
> The pleading entitled "Verified Motion to Determine Competency" has been set for hearing October 21, 2003 at 1:30 p.m. Defense counsel have cited no Indiana law in their brief, relying on cases from the United States Supreme Court, 3rd, 5th, 7th, 8th, 9th, and 10th Circuit Court of Appeals and State cases from Oklahoma and Wisconsin. The State has filed no responsive pleading, and is ordered to do so by October 15, 2003.

Appendix to Appellant's Brief, file marked March 30, 2004, at 80 (brackets in original).

On October 21, 2003, the state post-conviction court held a hearing on the motion to determine competency. Mr. Corcoran testified under oath and said,

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I believe that I should be executed since I am guilty of four counts of murder.

Post-conviction transcript dated October 21, 2003 at 89. On December 19, 2003, the post-conviction court held a follow-up hearing and issued a written order finding Mr. Corcoran competent. In the written opinion, the court noted that, "The evidence is clear that the Defendant suffers from a mental illness." Appendix to Appellant's Brief, file marked March 30, 2004, at 247.

> The issue before this Court, however, is not whether the Defendant suffers from a mental illness, but rather whether he is competent to waive post-conviction review of his convictions and death sentence. The statutes governing comprehension to stand trial, and the case law interpreting those statutes indicate, if a Defendant understands the nature of the proceedings and is able to assist counsel in the preparation of his defense, then that Defendant is competent to stand trial. The trial Court's observations of the Defendant and the Defendant's own comments and statements may also be considered in a competency determination.
> . . .
> The dialogue the State and the Court had with the defendant clearly indicate he is competent and understands what he is doing. While his choice of action may be unwise, and obviously against the advice of counsel, he is competent to make this ultimate decision in spite of his mental illness.

Appendix to Appellant's Brief, file marked March 30, 2004, at 247-48. At the hearing, after finding that Mr. Corcoran was competent, the judge offered him an opportunity to sign the post-conviction relief petition and proceed. Mr. Corcoran stated, "I don't want to appeal." Post-conviction transcript dated December 19, 2003 at 10.

Thereafter, his attorneys appealed the determination of competency.

> On November 16, 2004, Corcoran filed a request with this Court, accompanied by an affidavit indicating his intention to pursue post-conviction relief after all, asking us to dismiss this appeal of the trial court's competency determination as moot and return this case to that court for post-conviction proceedings.

*Corcoran v. State*, 820 N.E. 2d 655, 658 (Ind. 2005). That request was denied. The Indiana Supreme Court affirmed the finding of competency. Justice Sullivan wrote the opinion and was joined by three other justices; Justice Rucker dissented with a lengthy opinion. He began by stating, "I respectfully dissent because I believe Corcoran is not competent to waive his right of post-conviction review." *Corcoran v. State*, 820 N.E. 2d 655, 665 (Ind. 2005) (Rucker J., dissenting). The petition for rehearing was denied in a published opinion on May 12, 2005. *Corcoran v. State*, 827 N.E.2d 542 (Ind. 2005). Justice Sullivan wrote the opinion and was joined by three other justices; Justice Rucker dissented with a brief opinion based on the reasons previously stated and because "it essentially forecloses any chance that Corcoran may obtain post-conviction review of his conviction and sentence." *Corcoran v. State*, 827 N.E.2d 542, 547 (Ind. 2005) (Rucker, J., dissenting).

On February 10, 2005, Corcoran filed a signed post-conviction relief petition. Appendix to Appellant's Brief, file marked September 27, 2005, at 315-62. The post-conviction court dismissed it as untimely.

> After a review of these pleadings, the Supreme Court's May 12, 2005 Opinion, the Supreme Court Order approving the trial court's case management schedule, the trial court finds the Petition for Post-Conviction Relief filed on February 10, 2005 is untimely. (Seventeen (17) months past the September 9, 2003 deadline.)
> Pursuant to the Supreme Court approved case management schedule, defendant was required to file a proper Petition for Post-Conviction relief on or before September 9, 2003. As defendant did not comply with this required deadline, the Petition filed February 10, 2005 is ordered dismissed as time-barred.

Appendix to Appellant's Brief, file marked September 27, 2005, at 390-91. Returning to the Supreme Court of Indiana, the court affirmed on April 18, 2006. Justice Sullivan again wrote the

opinion and was joined by three other justices; Justice Rucker dissented without a separate opinion.

*Corcoran v. State*, 845 N.E. 2d 1019 (Ind. 2006).


## II. TIMELINESS OF THIS HABEAS CORPUS PETITION

On June 27, 2005, counsel for Mr. Corcoran initiated these habeas corpus proceedings. The

court feels compelled to note at this point that this habeas corpus petition is seriously untimely.

Habeas Corpus petitions are subject to a one year statute of limitations.

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Here, the 1-year period of limitation ran from the date on which the judgment became final

at the expiration of the time for seeking direct review pursuant to subparagraph A. There has been

no argument presented to this court nor any factual basis in this record to indicate that the state

prevented Mr. Corcoran from filing a application for a writ of habeas corpus anytime he so wanted.

Though the confusion over Mr. Corcoran's post-conviction relief petitions may have been a

distraction, they in no way obstructed him from filing a habeas corpus petition; therefore

subparagraph B is not applicable. There is no argument here based on a newly recognized constitutional right made retroactively applicable to cases on collateral review; therefore subparagraph C is not applicable. Finally, there is no argument here based on newly discovered evidence; therefore subparagraph D is not applicable.

After conviction and sentencing, Mr. Corcoran took a direct appeal which resulted in remand for re-sentencing followed by a second direct appeal. The Supreme Court of Indiana affirmed; later it denied his petition for rehearing on March 4, 2003. The United States Supreme court has noted favorably that, "The Courts of Appeals have uniformly interpreted 'direct review' in §2244(d)(1)(A) to encompass review of a state conviction by this Court." *Clay v. United States*, 537 U.S. 522, 528, n.3 (2003); *see also Lawrence v. Florida*, ___ U.S. ___, ___; 127 S. Ct. 1079, 1084 (2007). Therefore the time for seeking direct review of his conviction did not expire until the passage of the ninety days for filing a petition for certiorari. Allotting those ninety days, the 1-year period of limitation began to run on June 3, 2003.

28 U.S.C. § 2244(d)(2) provides for tolling during the time in which a "properly filed" State post-conviction petition is pending, but "[a] collateral attack that is untimely under state law is not 'properly filed.'" *Brooks v. Walls*, 279 F.3d 518, 521 (7th Cir. 2002). As the Supreme Court of Indiana made clear in several opinions, Mr. Corcoran did not ever have a properly filed post-conviction petition. *Corcoran v. State*, 820 N.E. 2d 655 (Ind. 2005); *Corcoran v. State*, 827 N.E. 2d 542 (Ind. 2005); and  *Corcoran v. State*, 845 N.E. 2d 1019, 1024 (Ind. 2006) ("We affirm the post-conviction court's dismissal of Joseph Corcoran's February 10, 2005 petition for post-conviction relief. We hold that the February 10, 2005 petition does not relate back to the

unverified September 9, 2003 petition as the latter was not timely filed.") Therefore nothing tolled the 1-year period of limitation and it expired on June 3, 2004.

Therein lies the problem. This habeas corpus proceeding was not initiated until more than a year later on June 27, 2005. The Supreme Court has upheld the validity of the statute of limitations found in 28 U.S.C. § 2244(d), even where is cuts off all federal review of a death sentence. *See Lawrence v. Florida*, ___ U.S. ___, ___; 127 S. Ct. 1079, 1084 (2007). Nevertheless, the respondent did not raise this issue, nor mention in this proceeding whether the petition was timely. "A statute of limitations defense . . . is not 'jurisdictional,' hence courts are under no obligation to raise the time bar *sua sponte*." *Day v. McDonough*, 547 U.S. 198, ___; 126 S.Ct. 1675, 1681 (2006). Therefore, "district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition." *Day v. McDonough*, 547 U.S. 198, ___; 126 S.Ct. 1675, 1684 (2006).

In *Day*, the respondent erroneously calculated the time and the Supreme Court held that where "there was merely an inadvertent error, a miscalculation that was plain" *Day v. McDonough*, 547 U.S. 198, ___; 126 S.Ct. 1675, 1685 (2006), the court could, in its discretion and with procedural limitations, raise the 1-year period of limitation *sua sponte*. Nevertheless, where a state has intelligently chosen to waive this defense, a court is not "at liberty to disregard that choice." *Day v. McDonough*, 547 U.S. 198, ___; 126 S.Ct. 1675, 1685 (2006).

Here, the respondent has not miscalculated because there is no calculation nor even any mention as to timeliness in the respondent's brief. Nevertheless, it does not appear that the omission was inadvertent because during the inchoate state post-conviction proceedings, the respondent, on May 25, 2005, included this footnote in a memorandum seeking the dismissal of the February 10, 2005 post-conviction relief petition.

10

> In addition to Corcoran's time-bar for post-conviction review, any federal habeas petition will similarly be time-barred under 28 U.S.C. § 2244(d). That statute of limitations requires any federal habeas petition to be filed within one year of the denial of certiorari review in the U.S. Supreme Court on direct appeal. While the proper filing of a state post-conviction petition tolls that limitations period during the time which the post-conviction petition is pending in state court, Corcoran allowed more than one-year to pass before filing a state post-conviction petition (even assuming that the instant petition was properly filed under the meaning of the federal statute), so any federal habeas petition is time-barred in its own right. *See e.g., Pace v. DiGuglielmo*, 544 U.S. [408], 125 S.Ct. 1807 (2005).

Appendix to Appellant's Brief, file marked September 27, 2005, at 388. This footnote clearly demonstrates that the respondent was aware that this habeas corpus petition was untimely. Therefore it appears that the respondent chose to waive this defense. However, because this issue was not addressed by counsel, it is at least theoretically possible that it was an inadvertent omission. Nevertheless, because the respondent had actual knowledge of the untimeliness of the petition, yet did not raise this defense in the return, the court will not exercise any discretion that it might have to address this petition's untimeliness other than to note it for the record.

## III. STANDARD OF REVIEW

Certainly as a generalized proposition, the facts found by the highest court of the State of Indiana are entitled to a rebuttable presumption of correctness under 28 U.S.C. § 2254(e)(1), and the burden is on the petitioner in that issue to otherwise show the same by clear and convincing evidence.

> AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it

11

confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

*Brown v. Payton*, 544 U.S. 133, 141 (2005) (citations omitted).

As we have explained, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied a [United States] Supreme Court case incorrectly. Rather it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Price v. Vincent*, 538 U.S. 634, 641 (2003) (quotation marks, citations and brackets omitted).

Thus, the United States Supreme Court has made clear that it is not for this court to decide the merits of the petitioner's arguments from scratch. Rather, the task laid out before this court in a § 2254 habeas corpus petition is to determine whether the decision of the state court, in this case the Supreme Court of Indiana, falls outside of that broad swath of reasonable interpretations of the law based solely on the holdings of United States Supreme Court opinions at the time of the state court decision.

Additionally, there is the question of procedural default where a petitioner has not properly raised a question before the state's highest court.

Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus, *see* 28 U.S.C. § 2254(b)(1)(A), is the duty to fairly present his federal claims to the state courts. *Baldwin v. Reese*, 541 U.S. 27 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). "Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in the federal habeas proceeding does it make sense to speak of the exhaustion of state remedies." *Id.* at 276. Fair presentment in turn requires the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings. *Boerckel*, 526 U.S. at 845. This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory. *Ibid*.

12

A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim. *See id.* at 848-49; *see also*, *e.g.*, *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999); *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997). A procedural default will bar federal habeas relief unless the petitioner can demonstrate both cause for and prejudice stemming from that default, *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977), or he can establish that the denial of relief will result in a miscarriage of justice, *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his federal claim to the state courts. *Id.* at 488, 492. Prejudice is established by showing that the violation of the petitioner's federal rights "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). In order to show, alternatively, that a miscarriage of justice would result if habeas relief is foreclosed, the petitioner must show that he is actually innocent of the offense for which he was convicted, *i.e.*, that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court. *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995).

*Lewis v. Sternes*, 390 F.3d 1019, 1025-1026 (7th Cir. 2004) (parallel citations omitted).


## IV. GROUND 1 - SIXTH AMENDMENT JURY TRIAL RIGHT

The petitioner argues that, "Indiana unconstitutionally sought to chill or squelch the assertion of his constitutional right to a jury trial by penalizing Petitioner with a death sentence for exercising that right." Petition at 10, docket # 13. The respondent argues that, "the Indiana Supreme Court correctly recognized that the United States Supreme Court, in jurisprudence rendered approximately a decade in the wake of [*United States v.*] *Jackson*[, 390 U.S. 570 (1968)], unambiguously approved of a prosecutor's ability to offer leniency in plea negotiations." Return at 15, docket # 33. The Supreme Court of Indiana addressed this argument in Corcoran's first direct appeal.

The defendant contends that Indiana's death penalty scheme impermissibly infringes, facially and as applied, upon the right to jury trial. He argues that, because identical factors may support a prosecutor's decision to seek either death or life imprisonment, the statute enables prosecutors to seek the death penalty "to coerce an

individual who refuses to plead guilty to relinquish a constitutional right" to jury trial. Brief of Appellant at 46. <u>The defendant asserts that in his case he declined the State's offer to accept a guilty plea or try his case to the bench and thereby avoid the death penalty.</u> He urges that because the prosecutor thus believed that life imprisonment was the appropriate penalty, the request for the death penalty had no basis except to provide "a strategic advantage . . . to force the defendant to abdicate a basic right." Brief of Appellant at 47.

We disagree. Prosecutors are traditionally given wide discretionary power in our criminal justice system to select the persons to be prosecuted and to plea-bargain with them. The Supreme Court has recognized the benefits of efficiency and speedy dispositions that plea-bargaining offers, and has fully approved its use as long as it is accompanied by safeguards that insure full knowledge on the part of the defendant offering a guilty plea as to his rights, his consequent waiver of those rights, the crime to which he is pleading guilty, and the maximum penalty or the extent to which he places himself at risk. *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978). <u>In the context of plea-bargaining, we do not see a material distinction in the discretionary powers of the prosecutor in offering to agree to a lesser sentence for a guilty plea or for a bench trial.</u> Our case law, which proscribes the imposition of a harsher sentence because a defendant exercised his right to jury trial, is rightly focused on the actions of the judge as sentencer and not the prosecutor as charger. *See Hill v. State*, 499 N.E.2d 1103, 1107 (Ind. 1986) ("Whether the severity of a particular sentence was improperly influenced by a defendant's jury trial election requires an individualized consideration." *Id.* Factors to be considered are (1) the role the judge played in the plea negotiations; (2) whether the judge encouraged the defendant to plead guilty; (3) the presence of threats from the judge of a more severe sentence if convicted following a jury trial; and (4) any evidence that the trial judge penalized the defendant for going to trial. *Pauley v. State*, 668 N.E.2d 1212, 1213 (Ind. 1996); *Hill* [*v. State*], 499 N.E.2d [1103] at 1107 (Ind. 1986)).

The defendant did not waive his right to jury trial and fails to point to anything in the record that indicates he received a more severe sentence from the court because he exercised his right to jury trial. Absent a specific showing that a particular sentence was improperly influenced by the defendant's exercise of his right to jury trial, which is not presented here, we decline to reverse.

*Corcoran v. State*, 739 N.E.2d 649, 654 (Ind. 2000) (emphasis added).

It is of critical importance to note that the Supreme Court of Indiana recognized that the petitioner faced two distinct offers from the prosecutor prior to trial. First, he was offered the opportunity to plead guilty. In exchange the prosecutor would not seek the death penalty. Second,

14

he was offered the opportunity to waive his right to a jury trial and proceed with a bench trial. In exchange the prosecutor would not seek the death penalty.

The first offer is common in our system of justice. It is widely accepted and the petitioner does not argue here that the offered plea bargain was unconstitutional. Clearly it was not. It is well within prosecutorial discretion to offer to waive the death penalty in exchange for a guilty plea. "The power of a court to accept a plea of guilty is traditional and fundamental. Its existence is necessary for the practical administration of the criminal law." *United States v. Jackson*, 390 U.S. 570, 584-85 (1968) (quotation mark and ellipsis omitted).

> Plea bargaining flows from "the mutuality of advantage" to defendants and prosecutors, each with his own reasons for wanting to avoid trial. Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process. By hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial.

> While confronting a defendant with the risk of more severe punishment clearly may have a discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices is an inevitable -- and permissible -- attribute of any legitimate system which tolerates and encourages the negotiation of pleas. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty.

*Bordenkircher v. Hayes*, 434 U.S. 357, 363-364 (1978) (citations, quotation marks, and brackets omitted). Nothing in this opinion should be read to undermine or impugn the legitimacy of the process whereby a prosecutor negotiates with a criminal defendant to obtain a guilty plea.

15

But a guilty plea was not the object of the second offer. That offer did not ask nor require the defendant to plead to anything, it only asked him to waive his right to a jury trial and proceed with the judge as the factfinder. Such an offer is not common. Indeed, the court has neither found nor been cited to any other case where a prosecutor sought to induce a defendant to waive only his right to a jury trial in exchange for avoiding the possibility of the death penalty, or anything else. Neither can such an offer be considered a plea bargain since no plea is involved. It was not a confession that was asked of the defendant, but rather only a waiver of his right to a trial by jury.

At first blush, the question arises, what harm is caused by such an offer? If a defendant can trade away a panoply of rights by pleading guilty, why can he not trade away but one of them? The Supreme Court of Indiana said, "In the context of plea-bargaining, we do not see a material distinction in the discretionary powers of the prosecutor in offering to agree to a lesser sentence for a guilty plea <u>or for a bench trial</u>." *Corcoran v. State*, 739 N.E.2d 649, 654 (Ind. 2000) (emphasis added). Though as discussed, no plea is involved in the second offer. Nevertheless, the State Supreme Court saw no material distinction between the two offers. If it was the prosecutor's goal to dissuade the defendant from demanding a jury trial, he failed. The defendant demanded a jury trial and he got it. Furthermore, the defendant had the right to waive a jury trial, so what error is caused by receiving a benefit for choosing to exercise a lawful option? So too, the prosecutor had the authority to seek the death penalty or not, so what error is caused by conditionalizing his discretion?

When one pleads guilty, many rights are waived. Could the prosecutor have legitimately offered a different deal based on one of those other rights that are also relinquished as a part of a guilty plea? Could he have offered to waive the death penalty in exchange for waiving the Fifth Amendment right against self-incrimination merely to permit the prosecutor to comment on the

16

defendant's failure to take the stand in his own defense? This would certainly simplify appeals involving whether the prosecutor strayed too far in closing argument. Could the death penalty be traded for the Sixth Amendment right to a public trial thereby permitting a secret adjudication? Alternatively, could the death penalty be swapped for the Sixth Amendment right to call witnesses in his defense? Further, could it be bartered for the Sixth Amendment right to confront and cross examine witnesses against him thereby barring the defendant and his counsel from observing the state's case in chief? This would transform the petit jury into more of a grand jury. What about conditioning the death penalty on surrendering the Sixth Amendment right to an impartial jury by requiring the defendant to waive his right to participate in jury selection or to comment on the prosecutor's challenges during *voir dire*? Then again, a defendant has the right to fire his lawyer and proceed *pro se*, so could the death penalty be conditioned on relinquishing his Sixth Amendment right to counsel and proceeding at trial unrepresented?

The reason that these theoretical prosecutorial offers offend our sensibilities is not because the death penalty is used as a bargaining chip, after all it is clearly a bargaining chip when it is offered in exchange for a guilty plea. Rather, the visceral reaction arises because what is traded in exchange is not a confession of the truth of the criminal allegations, but the very procedural safeguards we have enacted to protect the judicial process. Such offers do more than attempt to abrogate a single individual's rights, they tinker with the rules that promote societal trust in our system of justice. It is beyond doubt that prosecutors can negotiate for guilty pleas. What they cannot do is strike a deal whose object is nothing more than a punishment for the exercise of a constitutional right.

This is not a new legal principle. In striking down the death penalty provisions of the Federal Kidnaping Act, the United States Supreme Court determined that the death penalty cannot be conditioned on a jury trial demand.

> Under the Federal Kidnaping Act, therefore, the defendant who abandons the right to contest his guilt before a jury is assured that he cannot be executed; the defendant ingenuous enough to seek a jury acquittal stands forewarned that, if the jury finds him guilty and does not wish to spare his life, he will die. Our problem is to decide whether the Constitution permits the establishment of such a death penalty, applicable only to those defendants who assert the right to contest their guilt before a jury. The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional. But, as the Government notes, limiting the death penalty to cases where the jury recommends its imposition does have another objective: It avoids the more drastic alternative of mandatory capital punishment in every case. In this sense, the selective death penalty procedure established by the Federal Kidnaping Act may be viewed as ameliorating the severity of the more extreme punishment that Congress might have wished to provide.
>
> The Government suggests that, because the Act thus operates to mitigate the severity of punishment, it is irrelevant that it may have the incidental effect of inducing defendants not to contest in full measure. We cannot agree. Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. The question is not whether the chilling effect is "incidental" rather than intentional; the question is whether that effect is unnecessary and therefore excessive. In this case the answer to that question is clear. The Congress can of course mitigate the severity of capital punishment. The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial.

*United States v. Jackson*, 390 U.S. 570, 581-82 (1968) (footnotes, quotation marks, and citations omitted; emphasis added). A decade later, the United States Supreme Court contrasted plea bargaining with merely punishing the exercise of a constitutional right.

> To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to

18

> pursue a course of action whose objective is to penalize a person's reliance on his
> legal rights is patently unconstitutional. But in the give-and-take of plea bargaining,
> there is no such element of punishment or retaliation so long as the accused is free
> to accept or reject the prosecution's offer.

*Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (citations and quotation marks omitted).

The Supreme Court of Indiana wrote that it did, "not see a material distinction in . . . offering to agree to a lesser sentence for a guilty plea or for a bench trial." *Corcoran v. State*, 739 N.E.2d 649, 654 (Ind. 2000). That ruling was an unreasonable application of these clearly established United States Supreme Court precedents. Twice the United States Supreme Court discussed and contrasted guilty pleas with negotiations which merely penalized the exercise of a constitutional right. In both instances, the later was criticized. In *Jackson*, the focus was on the penalty and the discussion of plea bargaining was used in contrast. In *Bordenkircher*, the focus was on plea bargaining and the discussion of penalties was used as a contrast. Nevertheless, in both instances, the court was consistent in stating that a material distinction existed between agreeing to a lesser sentence in return for a guilty plea as opposed to doing so in return for a bench trial or any other procedural constitutional right.

The Supreme Court of Indiana wrote that it considered an offer conditioned on a bench trial to be within "the discretionary powers of the prosecutor . . .." *Corcoran v. State*, 739 N.E.2d 649, 654 (Ind. 2000). That ruling was objectively unreasonable. Though *Jackson* specifically addressed an act of Congress, its legal principle was not so narrowly tailored. Prosecutorial discretion is broad, but there is no basis for accepting that the executive branch can implement an *ad hoc* offer where the legislative branch is prohibited from accomplishing the same result after public deliberation. Furthermore, *Bordenkircher* explicitly stated that an agent of the state could not penalize a person's

reliance on a constitutional right. *Bordenkircher* was focused on plea bargaining and prosecutors were clearly the state agents being most prominently discussed.

In addition to *Bordenkircher*, the Supreme Court of Indiana also cited *Hill v. State*, 499 N.E.2d 1103, 1107 (Ind. 1986) and *Pauley v. State*, 668 N.E.2d 1212, 1213 (Ind. 1996) in reaching its decision. Nothing in this opinion should be read to question the accuracy or legitimacy of *Hill* and *Pauley*, only their applicability to the facts of this case. Both *Hill* and *Pauley* involved a defendant who chose not to plead guilty, proceed with a jury trial, and was given a longer sentence than an accomplice. Though the language of both cases said that the defendant exercised his right to a jury trial (which they did), the question in those cases was whether the defendants were penalized because they did not plead guilty. Neither of those cases addressed the question of whether the trials were to a jury or to the bench. Thus both *Hill* and *Pauley* were about guilty pleas, not about waiving a jury and being tried by a judge. Therefore neither of them are applicable to the fact pattern of this case.

The only additional case the respondent discusses is *Corbitt v. New Jersey*, 439 U.S. 212 (1978), but it is of no benefit to the respondent because as the United States Supreme Court stated,

> There is no difference of constitutional significance between *Bordenkircher* and this case. There, as here, the defendant went to trial on an indictment that included a count carrying a mandatory life term under the applicable state statutes. There, as here, the defendant could have sought to counter the mandatory penalty by tendering a plea. In *Bordenkircher*, as permitted by state law, the prosecutor was willing to forgo the habitual criminal count if there was a plea, in which event the mandatory sentence would have been avoided. Here, the state law empowered the judge to impose a lesser term either in connection with a plea bargain or otherwise. In both cases, the defendant gave up the possibility of leniency if he went to trial and was convicted on the count carrying the mandatory penalty. In *Bordenkircher*, the probability or certainty of leniency in return for a plea did not invalidate the mandatory penalty imposed after a jury trial. It should not do so here, where there was no assurance that a plea would be accepted if tendered and, if it had been, no assurance that a sentence less than life would be imposed. Those matters rested ultimately in the discretion of the judge, perhaps substantially influenced by the prosecutor and the plea-bargaining process permitted by New Jersey law.

*Corbitt v. New Jersey*, 439 U.S. 212, 221-222 (1978) (footnotes omitted). *Corbitt*, like *Hill* and

*Pauley*,is about the juncture between pleading guilty or going to trial, not about whether to be tried

by a judge or a jury. *Corbitt* involved the legislative decision to codify the constitutionally

permissible prosecutorial option of leniency in return for a guilty plea. That is to say, the United

States Supreme Court, by analogizing *Corbit* to *Bordenkircher*, agreed that the legislature can do

through public deliberation what the executive can do through a plea bargain. The distinction

between the statutes in *Corbitt* and *Jackson* is that *Corbitt* avoided the bench trial vs. jury trial

conflict that caused the death penalty provisions of the statute in *Jackson* to be struck down.

> The cases in this Court since *Jackson* have clearly established that not every burden
> on the exercise of a constitutional right, and not every pressure or encouragement to
> waive such a right, is invalid. Specifically, there is no *per se* rule against encouraging
> guilty pleas. We have squarely held that a State may encourage a guilty plea by
> offering substantial benefits in return for the plea. The plea may obtain for the
> defendant the possibility or certainty not only of a lesser penalty than the sentence
> that could be imposed after a trial and a verdict of guilty, but also of a lesser penalty
> than that required to be imposed after a guilty verdict by a jury.

*Corbitt v. New Jersey*, 439 U.S. 212, 220 (1978) (footnotes, quotation marks, ellipsis, brackets, and

citations omitted). *Corbitt* does not permit conditionalizing the death penalty on waiving a jury trial

and proceeding with a bench trial instead.

Here, the petitioner was punished when he refused to waive his right to a jury trial and agree

to allow a judge to determine his guilt. The time sequence of such an offer and the filing of death

penalty charges is not relevant. That is to say, it does not matter whether the offer is to dismiss

previously filed charges or to refrain from filing in the future. The constitutional taint is the same.

Nevertheless, the sequence of events in this case is important. The petitioner was charged with

murder and negotiations ensued. Though it is not clear when they began, nor how long they lasted,

what is clear is that nine and a half months later they ended when, on the record, the prosecution

withdrew from further discussions and announced the intent to seek the death penalty. Trial Record at 151. The petitioner did not agree to be tried by a judge sitting without a jury and as a direct consequence, the prosecutor sought the death penalty. But for his demand for a jury trial, rather than a bench trial, he would not have faced the death penalty.

Because the Supreme Court of Indiana did not see any material distinction between a guilty plea and the waiver of the right to a jury trial, it did not attempt to identify any other purpose or effect for the waiver of this procedural constitutional right. Neither has the respondent advanced any. In this way, it as if neither fully grasp the difference between refusing to plead guilty and demanding a trial, as opposed to, refusing to consent to a bench trial and demanding a jury trial. Without any possible explanation otherwise presented, the court can find no necessary reason to warrant the excessive effect of punishing the petitioner's assertion of his right to a jury trial rather than consenting to a bench trial. *See Jackson* at 582. Therefore it is the holding of this court that the prosecution unconstitutionally penalized the petitioner by seeking the death penalty when the petitioner refused to consent to the prosecution's offer to forgo the death penalty in exchange for the defendant's consent to waive a jury trial and proceed with a determination of guilt by the judge. This offer by the prosecution was a violation of the petitioner's Sixth Amendment right to a jury trial.

As a remedy for this constitutional violation, the petitioner seeks a new trial. Traverse at 28, ¶ 2, docket # 39. A new trial is not the appropriate relief. Neither the prosecution's offer nor the charged death penalty denied the petitioner a fair trial. The petitioner wanted a jury trial and he had a jury trial. A jury found him guilty of these four homicides. Nothing about the offer or the charged death penalty impugned the fairness of his jury trial. Therefore a new trial is neither necessary nor appropriate. As discussed, the unconstitutional punishment was seeking the death penalty. The

correct remedy is to remove the punishment caused by the filing of death penalty charges; this only requires re-sentencing to other than a death sentence. Such a remedy is consistent with the remedy provided in *Jackson*. There the court struck down the death penalty provisions of the Federal Kidnaping Act, but left balance of the law. So too, here the death sentence must be struck down and the case remanded for re-sentencing without the option of re-imposing the death sentence.

## V. GROUND 2 - SENTENCING ERRORS

### GROUND 3 - UNCONSTITUTIONALITY OF THE INDIANA DEATH PENALTY STATUTE

### GROUND 4 - PROSECUTORIAL MISCONDUCT DURING PENALTY PHASE

### GROUND 7 - INCOMPETENT TO BE EXECUTED

The remedy sought for the errors alleged in Grounds 2 and 3 is re-sentencing. Traverse at 29, ¶¶ 3 and 4, docket # 39. In light of the court's conclusion that re-sentencing is required as a result of Ground 1, the court declines to further address Grounds 2 or 3.

The remedy sought for Ground 4 is remand for a review of the merits of the alleged prosecutorial misconduct during the penalty phase. Traverse at 29, ¶¶ 5, docket # 39. Given this court's conclusion that re-sentencing is required as a result of Ground 1, any possible error during the penalty phase is rendered moot. Therefore the court declines to further address Ground 4.

In Ground 7, the petitioner argues that he is not competent to be executed. Re-sentencing based on Ground 1 to a sentence other than the death penalty renders this challenge moot. Therefore the court declines to further address Ground 7.

## VI. GROUND 5 - INCOMPETENCY TO STAND TRIAL

The petitioner argues that he was incompetent during his state trial. The respondent argues that this claim is procedurally defaulted. In his traverse, the petitioner argues that claims of competency at trial cannot be waived and can be raised at any time. This simply is not true.

> We now make it explicit: <u>In all cases</u> in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (emphasis added). The petitioner does not argue that the state court rulings were not made pursuant to independent and adequate procedural rules. Rather, the petitioner cites *Pate v. Robinson*, 383 U.S. 375 (1966); *Gosier v. Welborn*, 175 F.3d 504 (7th Cir. 1999); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997); and *Matheney v. Anderson*, 60 F.Supp.2d 846 (N.D. Ind. 1999) in support of his position.

*Pate* does not speak to the question of procedural default nor whether trial competency can be challenged for the first time in a habeas proceeding. But even if it did, the holding in *Coleman*, coming as it did 33 years after *Pate*, would still be controlling. In *Pate*, the competency question had been raised and addressed by the state supreme court. See *Pate v. Robinson*, 383 U.S. 375, 387 (1966) (Harlan, J., dissenting) ("The facts now canvassed by this Court to support its constitutional holding were fully sifted by the Illinois Supreme Court."). Therefore, *Pate* offers no assistance in deciding whether competency for trial can be raised for the first time in a habeas petition.

The three lower court rulings cited by the petitioner are all more recent than *Coleman*, but they could not supercede it and are nevertheless inapplicable. *Gosier* does squarely address the question of procedural default. Its holding is based on confusion in Illinois law as to whether or not

24

trial competency must be raised on direct appeal. "A defendant reading the state court's opinions would not think it necessary to raise this issue on direct appeal, and the forfeiture doctrine therefore does not bar collateral review in federal court." *Gosier v. Welborn*, 175 F.3d 504, 507 (7th Cir. 1999). Though it does not use the word "adequate", *Gosier* is based on a determination that the state court ruling was not based on an adequate state procedural rule because it had not been consistently applied. Furthermore, the petitioner here has not argued that Indiana does not have an adequate procedural rule or that any such confusion exists in Indiana law.

*Liegakos* addressed a new interpretation of Wisconsin law by its supreme court which subsequently prevented collateral review of claims which could have been raised on direct appeal. Wisconsin applied this ruling retroactively to cases on direct appeal before the new rule was announced. The Seventh Circuit explicitly found that was, "not an 'adequate' state ground for appeals briefed before its announcement." *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997). The petitioner, citing *Liegakos*, also argues that, "AEDPA does not apply due to the procedural default ruling." Traverse at 16, n.5, docket # 39. It is true that *Liegakos* found that 28 U.S.C. § 2254(d) only applied to claims adjudicated on the merits in State court proceedings, but §2254(d) is not in question in regard to this ground. The procedural default question turns on whether these claims were exhausted as required by 28 U.S.C. § 2254(b)(1)(A).

*Matheney* contains dicta saying that competency for trial can be raised at any time, but that question was not at issue in *Matheney* because competency had been raised to the Indiana Supreme Court. "Thus, it appears that Matheney properly raised the claims before the state court." *Matheney v. Anderson*, 60 F. Supp. 2d 846, 860 (N.D. Ind. 1999). On appeal, the Seventh Circuit also found that the issue had been raised and addressed by the Indiana Supreme Court. *Matheney v. Anderson*,

253 F.3d 1025, 1038 n.15 (7th Cir. 2001) ("The Indiana Supreme Court held: (1) Matheney was

competent to stand trial . . ..").

Therefore, pursuant to *Coleman*, this ground is barred from habeas review unless he can

demonstrate cause and prejudice or a fundamental miscarriage of justice. The petitioner has made

no effort to demonstrate either. Though he repeatedly argues that he is mentally ill and not

competent, these are not external factors demonstrating cause for procedural default.

> We have never considered whether mental illness can constitute cause for
> default. However, *Cawley v. Detella*, 71 F.3d 691 (7th Cir. 1995), is instructive on
> this question. In *Cawley*, we held that the petitioner's depression did not constitute
> cause because it failed "to qualify as an external impediment." *Id.* at 696. We are also
> guided by other circuits that have considered the issue. In *Hull v. Freeman*, 991 F.2d
> 86 (3d Cir. 1993), the Third Circuit determined that petitioner's borderline mental
> retardation did not establish cause because it was not "external" to his defense within
> the meaning of *Murray v. Carrier*, [477 U.S. 478, 488 (1986)]. [*Hull*,] 991 F.2d at
> 91. The Ninth Circuit, in *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988),
> held that petitioner's diagnosis as a "borderline mental defective" was insufficient to
> establish cause. *See also Cornman v. Armontrout*, 959 F.2d 727, 729 (8th Cir. 1992)
> (finding petitioner's below average intelligence insufficient to establish cause).
> Furthermore, it is well established in this Circuit that circumstances such as youth,
> lack of education, and illiteracy are not external impediments within the context of
> excusing procedural default. *See, e.g.*, *Dellinger v. Bowen*, 301 F.3d 758, 763 (7th
> Cir. 2002) (petitioner's youth and lack of education did not constitute cause);
> *Henderson v. Cohn*, 919 F.2d 1270, 1272-73 (7th Cir. 1990) (petitioner's illiteracy
> and limited education insufficient to establish cause).

> We find the reasoning in these cases persuasive. These cases highlight the
> emphasis placed on the "external" nature of the impediment. Something that comes
> from a source within the petitioner is unlikely to qualify as an external impediment.
> The examples given by the Court in *Murray* as to what constitutes an external
> impediment exemplify this point. Harris' low IQ and limited reading ability are not
> factors which are "external" to his defense.

*Harris v. McAdory*, 334 F.3d 665, 670 (7th Cir. 2003).

Neither is there any basis for finding a fundamental miscarriage of justice.

In order to show, alternatively, that a miscarriage of justice would result if habeas

relief is foreclosed, the petitioner must show that he is actually innocent of the

offense for which he was convicted, *i.e.*, that no reasonable juror would have found him guilty of the crime but for the error(s) he attributes to the state court. *Schlup v. Delo*, 513 U.S. 298, 327-29 (1995).

*Lewis v. Sternes*, 390 F.3d 1019, 1025-1026 (7th Cir. 2004) (parallel citations omitted). The petitioner here does not and has never argued that he is innocent of these four homicides.

Because the petitioner did not raise the question of his competency to stand trial in the state courts, and because he has not demonstrated either cause and prejudice nor the existence of a fundamental miscarriage of justice this ground is procedurally defaulted.

## VII. GROUND 6 - INCOMPETENCY TO WAIVE DIRECT APPEAL CLAIMS

In his traverse, the petitioner concedes that this claim is procedurally defaulted. "Respondent is correct, as the record currently stands, the claim is procedurally defaulted." Traverse at 21, docket # 39.

## VIII. GROUND 8 - INCOMPETENCY TO WAIVE POST-CONVICTION RELIEF CLAIMS

The petitioner argues that, "the state courts unreasonably found that Petitioner was competent and that he had knowingly, intelligently and voluntarily waived post-conviction review." Petition at 15, docket # 13. The respondent argues that the petitioner, "has no federal constitutional right to state collateral review . . . [but, regardless] the Indiana Supreme Court reasonably determined that Corcoran was competent to waive post-conviction proceeding by the standards set for by both *Dusky* and *Rees*." Return at 22-23, docket # 33. The petitioner replies that, "[i]n *St. Pierre v. Cowan*, 217 F.3d 939 (7th Cir. 2000), the Seventh Circuit lifted procedural bars based on a state court's incorrect determination of a waiver of state post-conviction remedies." Traverse at 23, docket # 39.

St. Pierre is not applicable here. First, it is not based on current law. See St. Pierre v. Cowan, 217 F.3d 939, 940 (7th Cir. 2000) ("Applying the legal standards that obtained before the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1214, we conclude that . . .."). In this case, the four homicides occurred in 1997, after the passage of AEDPA. Currently, the law requires that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added). The Supreme Court of Indiana adjudicated the petitioner's claim that he was not competent to waive his post-conviction claims. Therefore only United States Supreme Court cases can be used to determine the reasonableness of the state's determination. Because St. Pierre was decided by the Seventh Circuit, it is not relevant to this analysis.

The Supreme Court of Indiana provided the following analysis of the petitioner's competency to waive post-conviction review of his conviction and sentence.

> The State Public Defender attacks the trial court's competency determination on three grounds. First, she argues that the trial court applied an improper standard to determine competency. Second, she contends as a factual matter that Corcoran is incompetent to waive post-conviction review under any competency standard this Court might choose to employ. Third, she maintains that as a result of Corcoran's incompetence, he could not knowingly, voluntarily, or intelligently waive his right to post-conviction relief.
> A
> The State argues that the proper standard for determining the level of competency necessary for Corcoran to waive his right to post-conviction review was that set forth in Dusky v. United States, 362 U.S. 402 (1960) (per curium). In Dusky, the Supreme Court held that a defendant is competent to stand trial if "he has

28

sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and . . . has a rational as well as factual understanding of the proceedings against him." 362 U.S. at 402. The State relies on this standard in part because it is consistent with Indiana Code section 35-36-3-1, Indiana's statutory trial competency standard.

The State Public Defender argues that the proper competency standard is that announced in *Rees v. Peyton*, 384 U.S. 312 (1966) (per curiam). In *Rees*, the Supreme Court held that a capital defendant may withdraw a petition for certiorari only after it is determined whether "he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. at 314.

We are constrained to say that we find little if any difference between the standards enunciated in *Dusky* and *Rees*. *See Godinez v. Moran*, 509 U.S. 389, 398 n.9 (1993) (acknowledging that the difference between the *Dusky* and *Rees* standards is not readily apparent and may only be one of terminology). A number of federal courts that have faced this question have been unable, or felt it unnecessary, to attempt to discern a difference between the two tests. *See Dennis v. Budge*, 378 F.3d 880, 889 (9th Cir. 2004) (refusing to resolve whether there is any difference between the *Rees* and *Dusky* standards because the analytical outcomes under each test would be the same); *Michael v. Horn*, 2004 U.S. Dist. LEXIS 3702 (M.D. Pa. 2004) (relying on both the principles of *Rees* and *Dusky* to determine competency to forego a collateral challenge); *Groseclose v. Dutton*, 594 F. Supp. 949, 957 n.4 (M.D. Tenn. 1984) (stating that *Dusky* is analytically equivalent to the *Rees* competency test).

Federal courts have been unwilling or unable to distinguish between the *Rees* and *Dusky* standards because both tests "highlight[] the constitutional necessity that a criminal defendant understand the proceedings and then be capable of aiding his legal counsel in choosing among legal alternatives." *Groseclose*, 594 F. Supp. at 957 n.4. Under both standards, the inquiry focuses on the individual's "discrete capacity to understand and make rational decisions concerning the proceedings at issue . . . ." *Mata v. Johnson*, 210 F.3d 324, 329 n.2 (5th Cir. 2000). Further, neither test treats "the presence or absence of mental illness or brain disorder [as] dispositive" proof of incompetence, but balances its presence or absence with other evidence. *Id.* Both tests appear to be equivalent in that each is applied in the same way to determine whether an individual has the capacity to comprehend the legal proceedings with which he or she is confronted and assist his or her counsel in choosing among the various legal alternatives.

For these reasons, we will evaluate the post-conviction court's competency determination under the principles of both standards.

### B

We have previously been required to review a post-conviction court's competency determination in a capital proceeding. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001). In *Timberlake*, we held that a post-conviction court's competency findings are afforded a high level of deference by a reviewing court. The

court's decision will be disturbed only "if the evidence is without conflict and leads only to a conclusion contrary to the result of the post[-]conviction court. *Id.* at 597.

The post-conviction court here acknowledged in its written findings that Corcoran suffers from a mental illness. The State also concedes that Corcoran suffers from a mental illness. At the competency hearing, the State Public Defender presented the testimony of three mental health experts, each of whom concluded that Corcoran suffers from paranoid schizophrenia. One of the symptoms of Corcoran's condition, according to the three experts, are recurrent delusions that Department of Correction prison guards are torturing him through the use of an ultrasound machine, causing him substantial pain and uncontrollable twitching.

On the basis of this diagnosis, all three experts concluded Corcoran was unable to make a rational decision concerning the legal proceedings confronting him. Each expert stated that Corcoran's decision to forego post-conviction review of his sentence, thereby hastening his execution, was premised on his desire to be relieved of the pain that he believes he experiences as a result of his delusions. To follow the experts' logic, Corcoran's decision to forego post-conviction review cannot be rational if based upon his delusions, which are irrational.

Corcoran, however, made no statement to any of the experts evaluating him indicating that he wished to end his appeals in order to escape his paranoid delusions. Corcoran's prison medical records and the testimony of each expert indicated that his psychotic symptoms were being controlled through various psychiatric medications. Corcoran himself spoke directly to his reasons for not pursuing post-conviction review and the contention that his delusions were prompting his actions at the post-conviction hearing stating:

> See, I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder, and I believe that I should be executed since I am guilty of four counts of murder.

(Super. Ct. Hr'g Tr. at 89). Corcoran's explicit denial that his delusions prompted him to waive his right to post-conviction review and his reasoning that his death sentence is commensurate with the crime he committed (the conclusion to which both the original trial court jury and judge came), makes it impossible for this Court to conclude that "the evidence is without conflict and leads only to a conclusion contrary to the result of the post[-]conviction court." *Timberlake*, 753 N.E.2d at 597.

Moreover, there is substantial evidence of record that Corcoran was aware of his legal position and the consequences of his decision to forego any further post-conviction review. When asked whether Corcoran has the capacity to understand his legal position, Dr. George Parker, who evaluated Corcoran in preparation for his post-conviction hearing stated:

> He has a very clear awareness of the status of his case. He is aware he has been sentenced to death. He is aware that he is in the

30

appeals process. He has a good memory of the events that have taken place from the time of the offense to the trial, to the sentencing phase, and then through the more extensive appeals phase. He is aware of the attorneys' positions and how, how the attorneys have changed over the course of the trial and then [the] appeals process. So, he has a good understanding of what is at issue.

(Super. Ct. Hr'g Tr. at 48). Dr. Robert Kaplan, who also evaluated Corcoran, testified that Corcoran was aware that by not continuing with post-conviction review that he would be executed.

Corcoran was questioned directly by both the State's attorney and the presiding judge regarding his awareness of the proceedings and his legal position. The State's attorney asked the following questions:

Question: Do you understand that by waiving these appeals, you are going to make that happen (his execution) relatively soon?

Corcoran: Yes, I understand.

Question: Do you understand that this appellate process is the opportunity for you to fight to stay alive?

Corcoran: Yes, I understand.

Question: And you are willing to accept the sentence that was handed down by this Court?

Corcoran: Correct.

(Super. Ct. Hr'g. Tr. at 13).

The post-conviction court then questioned Corcoran with respect to the entire history of his case. Corcoran stated that he was aware that he had been convicted of four capital crimes. He related that he understood the purpose of his initial direct appeal to the Indiana Supreme Court to review his death sentence and that his appeal had been unsuccessful. The judge then asked the following questions in order to ascertain Corcoran's level of awareness of the post-conviction proceedings taking place:

The Court: [Do] you understand that these proceedings are your last attempt to review this case?

Corcoran: Yes, I understand.

The Court: Do you also understand that if the review here, were it necessary up on appeal, is unsuccessful, that you would be executed?

Corcoran: Yes, I understand.

The Court: Has anyone, Mr. Corcoran, forced you to waive your rights to appeal?

Corcoran: No.

The Court: Has anyone threatened you to waive your rights to appeal?

Corcoran: No.

The Court: Did anybody tell you, anybody at all, tell you that you would get more favorable treatment if you waived your right to appeal?

Corcoran: No.

> The Court: You understand that the two ladies sitting to your left are appointed by the Court to represent you?
>
> Corcoran: Right, yes.
>
> The Court: Do you trust their judgment?
>
> Corcoran: I disagree with them, but I trust their judgment
>
> The Court: What do you disagree with them about?
>
> Corcoran: They didn't have to call a competency hearing, but they did anyway. I disagree with calling the competency hearing.
>
> The Court: You disagreed with them filing that motion?
>
> Corcoran: Correct.
>
> The Court: And you understand what their (defense attorneys') responsibilities are?
>
> Corcoran: Yes.
>
> The Court: And what [the deputy attorney general's] responsibilities are?
>
> Corcoran: Yes.
>
> The Court: And what my responsibilities are?
>
> Corcoran: Yes.
>
> The Court: And you know what we are doing here today?
>
> Corcoran: Yes.
>
> The Court: What were we doing here today?
>
> Corcoran: Determining my competency whether or not I am able to make a decision or not.

(Super. Ct. Hr'g Tr. at 87-88). Both the State's and post-conviction judge's questioning of Corcoran reaffirm the testimony of Dr. Parker that Corcoran was able to appreciate the gravity of his legal position and the consequences of his choice to waive further post-conviction review. The portions of the record described and set forth supra are also sufficient evidence to support the post-conviction court's determination that Corcoran made his choice knowingly, voluntarily, and intelligently.

Corcoran's awareness of his legal position and his ability to formulate a rational justification for forgoing further post-conviction review make him competent to waive such review under either *Rees* or *Dusky*. The evidence supports the trial court's conclusion that Corcoran has both a rational understanding of and can appreciate his legal position. Further, the evidence does not conclusively indicate that Corcoran's decision was not made in a rational manner. Thus, we are unable to conclude that "the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court," and so we affirm its competency finding. *Timberlake v. State*, 753 N.E.2d at 597 (*citing Harrison v. State*, 707 N.E.2d 767, 773 (Ind. 1999)).

*Corcoran v. State*, 820 N.E.2d 655, 658-662 (Ind. 2005) (footnotes and parallel citations omitted; brackets in original).

The petitioner would have this court review and re-weigh the evidence presented during his state competency hearing. Though the court has reviewed this record, it cannot re-weigh the testimony because that is not permitted under §2254(d) or (e). The Supreme Court of Indiana's determination is neither an unreasonable application of United State's Supreme Court law nor an unreasonable determination of the facts. The petitioner has not presented clear and convincing evidence to rebut the presumption of correctness given to the State Court's factual findings.

The petitioner argues that he does not meet the test set out in *Rees*, but he appears to ignore the word "substantially" as applied in the later prong of the test.

> [W]hether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may <u>substantially</u> affect his capacity in the premises.

*Rees v. Peyton*, 384 U.S. 312, 314 (1966) (emphasis added). The state courts acknowledged that the petitioner suffers from a mental illness and fully confronted this question. In the end they determined that his mental illness did not substantially affect his capacity to appreciate his position as a death row inmate and that he understood how and why he was there. Neither did his mental illness impact his understanding of his legal position *vis-à-vie* his appeals. Though philosophically one can question whether it can ever be a rational choice to abandon appeals which are the only means to avoid the death penalty, legally even *Rees* leaves no doubt that it is possible to do so. From a legal perspective, the state court's determination that the petitioner made a rational choice as not unreasonable.

The opinion of the Supreme Court of Indiana, as presented above, is thorough, thoughtful, and reasonable. Therefore no relief can be granted on this ground.


## IX. CONCLUSION

For the foregoing reasons, the court now **GRANTS** the petition with respect to Ground 1. The court declines to address Grounds 2, 3, 4, and 7 because they are rendered moot by granting the petition on Ground 1. The court **DENIES** the petition as to Grounds 5 and 6 because they are procedurally defaulted. The court **DENIES** the petition as to Ground 8 because the Supreme Court of Indiana was not unreasonable in determining that Joseph Edward Corcoran was competent to waive post-conviction review of his conviction and sentence.

The Great Writ is now **GRANTED** on Ground 1 conditioned upon the State of Indiana re-sentencing Joseph Edward Corcoran to a sentence other than the death penalty within 120 days of this order.

**IT IS SO ORDERED.**

**ENTERED: April 9, 2007**

**_____S/ ALLEN SHARP_____**
**ALLEN SHARP, JUDGE**
**UNITED STATES DISTRICT COURT**